**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **KATRINA WILLIAMS,**<br><br>    Plaintiff,<br><br>v.<br><br>**RAINBOW PEDIATRICS ASSOCIATES, P.C., THE UROLOGY INSTITUTE AND CONTINENCE CENTER, P.C., FRANK E. GLOVER, J.R., Individually, and MARSHA D. GLOVER, Individually,**<br><br>    Defendants. | Civil Action No. 7:18-CV-31 (HL) |

**ORDER**

Plaintiff Katrina Williams brought this action against Defendants Rainbow Pediatrics Associates, P.C. ("Rainbow Pediatrics"), The Urology Institute and Continence Center, P.C. ("Urology Institute"), Frank E. Glover, J.R. ("Dr. Frank Glover), and Marsha D. Glover ("Dr. Marsha Glover") to recover unpaid overtime wages under the Fair Labor Standards Act ("FLSA"). *See* 29 U.S.C. § 201, *et seq.* Before the Court is Defendants' Motion for Partial Summary Judgment. (Doc. 27). After reviewing the pleadings, briefs, and evidentiary materials presented, the Court determines that there are genuine issues of material fact that must be resolved by a jury. The Court accordingly **DENIES** Defendants' motion.

## I. FACTUAL BACKGROUND

The case arises from Plaintiff's employment with Dr. Marsha Glover at Rainbow Pediatrics and the work Plaintiff performed at Dr. Frank Glover's practice, the Urology Institute. (Doc. 1, Compl. p. 12–20). Dr. Marsha Glover is a licensed medical doctor in Georgia, where she practiced pediatrics. (Doc. 27-2, p. 2). Dr. Marsha Glover exclusively owns Rainbow Pediatrics; she served as Rainbow Pediatrics' owner, administrator, and physician at its two office locations in Moultrie and Thomasville, Georgia. (Dr. Marsha Glover's Dep. p. 10; Doc. 27-2, p. 2). These overlapping roles required Dr. Marsha Glover to handle the offices' billing, finances, and human resources responsibilities in addition to treating patients. (Dr. Marsha Glover's Dep. p. 20).

Dr. Marsha Glover is married to Dr. Frank Glover. (Dr. Marsha Glover's Dep. p. 8). Dr. Frank Glover is also a licensed physician; he specializes in urology. (*Id.* at 8). Dr. Frank Glover is the sole owner of the Urology Institute and its four office locations in Albany, Thomasville, Valdosta, and Moultrie, Georgia. (*Id.* at 9; Doc. 27-1, p. 4). Dr. Marsha Glover works as the chief executive officer ("CEO") and administrator of the Urology Institute. (Dr. Marsha Glover's Dep. p. 9).[1] Her duties as administrator include "billing, accounts payable, accounts receivable, [h]uman [r]esources, and the handling of regulatory matters." (Doc.

---

[1] When the Urology Institute opened in 1999, Dr. Marsha Glover began as its CEO; she assumed the role of administrator in 2016. (Dr. Marsha Glover's Dep. p. 9).

27-2, p. 2; *see* Dr. Marsha Glover Dep. p. 18–21). During the relevant period between March 25, 2016 and January 5, 2018, Dr. Marsha Glover worked as the CEO and administrator at Urology Institute as well as the administrator and physician at Rainbow Pediatrics. (Dr. Marsha Glover's Dep. p. 8–10).[2] During the workweek, Dr. Marsha Glover split time between the offices, treating her patients at Rainbow and performing administrator duties at the Urology Institute. (*Id.* at 21–22).

On or about March 25, 2016, Dr. Marsha Glover hired Plaintiff to work at Rainbow Pediatrics as a receptionist. (*Id.* at 28; Williams Aff. ¶ 5). Plaintiff traveled between Rainbow Pediatrics' office locations in Thomasville and Moultrie to assist Dr. Marsha Glover. (Dr. Marsha Glover's Dep. p. 54). Dr. Marsha Glover did not mention the Urology Institute during Plaintiff's interview. (Williams Aff. ¶ 7; Doc. 16, Defs. Answer ¶ 21). However, Plaintiff worked at the Urology Institute on various occasions between May 2016 and January 2018. (Dr. Marsha Glover Dep. p. 105). She performed receptionist duties, gathered supplies, attended trainings, and trained new employees at the Urology Institute. (*Id.* at 29–36). At all times, Dr. Marsha Glover and Rainbow Pediatrics employed Plaintiff. Rainbow Pediatrics exclusively paid her wages, even for work performed

---

[2] Dr. Marsha Glover also worked "on call" on certain weekends at Capital Regional Medical Center in Tallahassee, Florida. (Dr. Marsha Glover Dep. p. 15–16).

at the Urology Institute; Plaintiff never received a paycheck from Dr. Frank Glover or the Urology Institute. (*Id.* at 54).

Plaintiff alleges Defendants did not pay her for her work at the Urology Institute and that she was "only compensated for work performed at Rainbow Pediatrics." (Williams Aff. ¶ 22–30). While the parties agree that Plaintiff spent time at both clinics, the parties vigorously dispute the extent of Plaintiff's work at the Urology Institute and whether Rainbow Pediatrics adequately paid Plaintiff for her time at the Urology Institute. Plaintiff alleges that her work schedule split between Rainbow Pediatrics and the Urology Institute required her to work in excess of forty hours weekly, and Defendants violated the FLSA by not paying her overtime wages. (Compl. ¶ 40–42). Defendants contend that Plaintiff worked overtime between the clinics on only two occasions, and Rainbow Pediatrics' payroll records confirm Plaintiff was paid adequately for that overtime work. (Dr. Marsha Glover's Dep. p. 48–51). Defendants deny all other allegations of overtime work.

Undisputed is that Plaintiff submitted a letter to Dr. Marsha Glover on January 4, 2018, and Plaintiff's employment ended on January 5, 2018. (Doc. 27-8, 27-9, 34-1 p. 75). Plaintiff and Defendants dispute whether Plaintiff resigned from Rainbow Pediatrics or Dr. Marsha Glover fired her—an issue dependent upon how the parties characterize Plaintiff's letter. Defendants contend the letter was Plaintiff's resignation from all employment with Dr. Marsha Glover and Dr.

4

Frank Glover; Plaintiff characterizes the letter as a "written complaint," intended to end her employment with Dr. Frank Glover at the Urology Institute. (Compl. ¶ 34; Williams Aff. ¶ 31; Dr. Marsha Glover's Dep. p. 107–08). Plaintiff further alleges that she first made numerous verbal complaints concerning Defendants' failure to compensate her and that she submitted her "written complaint" only after Dr. Marsha Glover "disregarded" her verbal complaints. (Williams Aff. ¶ 31). Defendants deny that Plaintiff ever complained about her hours at the Urology Institute or her compensation. (Dr. Marsha Glover's Dep. p. 85; Doc. 27-1, p. 18).

A second letter—which is an edited version of the first letter—also appears in the evidentiary record. (Doc. 27-9). The second letter includes more specific references to the Urology Institute that are absent from Plaintiff's first letter. *Id.* Plaintiff alleges that in response to receiving her first letter, Dr. Marsha Glover "assured" her that she could continue her employment solely with Rainbow Pediatrics and then, "instructed" Plaintiff to submit another letter clarifying that she "would no longer provide services at the Urology Institute." (Williams Aff. ¶ 31). Defendants deny this allegation. (Dr. Marsha Glover Dep. p. 108–09). Defendants contend that Dr. Marsha Glover received only the first letter, and she never told Plaintiff to submit a second letter. *Id.*

On January 5, 2018, Dr. Marsha Glover gave Plaintiff a corresponding letter; it reads as follows: "[Y]esterday you presented your letter of resignation. I am accepting that letter and wish you all the best in your future endeavors." (Doc.

29-1, p. 102). This ended Plaintiff's employment with both Rainbow Pediatrics and the Urology Institute. Defendants argue this correspondence from Dr. Marsha Glover confirmed Plaintiff's resignation. Plaintiff maintains that she never resigned; Dr. Marsha Glover fired her and "attempted to disguise" Plaintiff's termination by writing the letter purportedly accepting Plaintiff's resignation. (Doc. 34; Doc. 1).

This lawsuit followed on February 21, 2018, wherein Plaintiff alleges that Defendants' failure to pay Plaintiff's overtime wages and subsequent retaliation against her violated the FLSA. (Doc. 1). Defendants now move for partial summary judgment on Plaintiff's FLSA claims.[3]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

---

[3] Defendants also seek summary judgment on Plaintiff's unjust enrichment, fraudulent misrepresentation, and breach of contract claims. (Doc. 27, p. 2). However, Defendants fail to argue their position or set forth any authority in their brief. (Doc. 27-1). Thus, Defendants' summary judgment motion as to Plaintiff's unjust enrichment, fraudulent misrepresentation, and breach of contract claims is not properly before the Court, and the Court will not rule of those issues.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. *Id.* at 254–55. However, the court may not make credibility determinations or weigh the evidence. *Id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Credibility determinations and weighing of the evidence are functions solely of a jury—"not those of a judge." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

Defendants argue that they are entitled to summary judgment because Plaintiff produced timesheets that do not prove she worked more than forty hours weekly. (Doc. 27-1, p. 10). Defendants have not produced their own time records maintained during Plaintiff's employment; they rely entirely on the timesheets Plaintiff kept. Defendants accept Plaintiff's timesheets as accurate time records representing Plaintiff's work at both Rainbow Pediatrics and the Urology Institute. Their Partial Motion for Summary Judgment tracks Plaintiff's timesheets and matches the time recorded with the work schedule Plaintiff alleges in her Complaint. *See generally* Doc. 27-1. Defendants point out specific dates where Plaintiff's timesheets do not reflect the schedule she alleges. Because "Plaintiff did not write down" on her timesheets "the schedule of hours alleged in her Complaint," Defendants argue they are entitled to summary judgment as to those specific dates. (Doc. 27-1, p. 12, 13, 15).

7

### A. FLSA Overtime Claims

The FLSA mandates that an employee cannot work longer than forty hours in a workweek unless the employee receives overtime compensation at a rate not less than one and a half times her regular rate. 29 U.S.C. § 207(a)(1). Plaintiff alleges that her schedule—determined by Dr. Marsha Glover—required Plaintiff to work at Rainbow Pediatrics and the Urology Institute, in excess of forty hours per week. Plaintiff's schedule at Rainbow Pediatrics never exceeded forty hours weekly, but Plaintiff alleges her additional time at the Urology Institute necessitated overtime compensation that Defendants refused to pay.

To succeed on an overtime-wages claim, plaintiffs must prove that they were permitted to work over forty hours without compensation. *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1314 (11th Cir. 2007). This means that Plaintiff must demonstrate that (1) she worked overtime without compensation, and (2) Defendants "knew or should have known of the overtime work." *Id.* at 1314–15. Although plaintiffs bear the burden of proof to satisfy their FLSA claims, the FLSA mandates record-keeping responsibilities to employers. *See* § 211(c) ("Every employer . . . shall make, keep, and preserve such records of the person employed by him and of the wages, hours, and other conditions and practices of employment."). The Supreme Court has held that if an employer fails to keep records:

> [t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). When an employer has violated its statutory duty to maintain proper records, the employee's burden becomes less demanding. *See Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1315 (11th Cir. 2013) (calling plaintiff's burden "relaxed" when employer failed to keep time records). A plaintiff-employee will have satisfied his burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens Pottery, Co.*, 328 U.S. at 687. The burden then shifts to the employer-defendant to present evidence of the precise amount of work performed or evidence that negates the reasonableness of the inferences drawn from plaintiff-employee's evidence. *Id.* at 688. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.*

Plaintiff claims her work schedule at Rainbow Pediatrics and the Urology Institute was as follows:

On Monday, Wednesday, and Friday, she worked at the Urology Institute between 6:30 a.m. and 8:00 a.m. (Williams Aff. ¶ 15). At 8:00 a.m., she traveled to Rainbow Pediatrics and performed her duties "until the end of the day," presumably 5:00 p.m. (*Id.*). After close of business, Plaintiff "clean[ed] the exam rooms and invoice[d] insurance companies" until approximately 6:00 p.m. (*Id.*). On Tuesday and Thursday, Plaintiff arrived at Rainbow Pediatrics at 5:00 a.m. (*Id.* at ¶ 16). At 5:30 a.m., Plaintiff traveled to the Urology Institute and worked there until 10:30 a.m. (*Id.*). At that time, she traveled back to Rainbow Pediatrics and worked until close. (*Id.*). Around 5:15 p.m., Plaintiff returned to the Urology Institute and "completed assigned tasks, trained staff, and close[d] the clinic" at approximately 6:30 p.m. (*Id.*).

Margarita Moreno, a former employee of the Urology Institute, submitted a declaration setting forth her work schedule, which indicates that she also split her workdays between Rainbow Pediatrics and the Urology Institute.[4] (Doc. 34-2); *see also* (Dr. Marsha Glover's Dep. p. 12–15). In Dr. Marsha Glover's

---

[4] Ms. Moreno's work schedule was as follows: on Mondays, she worked 9:00 a.m. to 5:00 p.m. at Rainbow Pediatrics. (Decl. Margarita Moreno ¶ 5). On Tuesdays and Thursdays, she worked from 7:00 a.m. to 1:30 p.m. at the Urology Institute, and between 1:30 p.m. to 5:00 p.m. at Rainbow Pediatrics. (*Id.*). On Wednesdays and Fridays, she worked at the Urology Institute from approximately 8:30 or 9:00 a.m. to 12:00 p.m., and at Rainbow Pediatrics between 12:00 p.m. and 3:00 p.m. (*Id.*). Moreno does not allege that she worked overtime hours.

deposition, she identified several other employees who worked at both clinics. (Dr. Marsha Glover's Dep. p. 24–26, 59–67).

Following Plaintiff's schedule, she would have worked many overtime hours. However, the timesheets that Plaintiff produced do not reflect the schedule she alleges. Plaintiff explains this discrepancy, alleging that Dr. Marsha Glover did not require her to submit timesheets. (Williams Aff. ¶ 18–20). Not all of the timesheets that Plaintiff produced in discovery were submitted to Dr. Marsha Glover during her employment; Plaintiff kept these timesheets merely as "notes" for her own records. (*Id.* at ¶ 20). Consequently, according to Plaintiff, the "notes," are incomplete and do not represent the actual hours she worked. (*Id.* at ¶ 21).

Dr. Marsha Glover acknowledged that she "would ask [for timesheets] occasionally but [she] had a lot of other stuff going on." (Dr. Marsha Glover's Dep. p. 84). In 2016, Dr. Marsha Glover required Plaintiff to turn in timesheets, but "later on" Plaintiff submitted her hours "sporadic[ally]," when Dr. Marsha Glover specifically requested her timesheets. (*Id.* at 83).

When asked how she kept track of Plaintiff's hours when Plaintiff failed to submit a timesheet, Dr. Marsha Glover responded:

> I wouldn't, except that looking . . . objectively and subjectively knowing that I was at Urology and seeing where she was working, then I can do that based on where I told her to go in Rainbow and what we discussed. If I said, Katrina, you know, we need your help [at Urology] or I need you to be at Rainbow . . . and this is when the

11

phones are forwarded and this is when the phones are unforwarded, then that's the way I could calculate that these were her hours being worked.

(*Id.* at 84–85). In short, Dr. Marsha Glover was "keeping mentally a note of where" Plaintiff was working and the number of hours she accumulated. (*Id.*).

Notwithstanding the lack of complete documentation, Defendants deny Plaintiff's alleged work schedule. Dr. Marsha Glover alleges that on "very few and far between" occasions did the Urology Institute open at 5:00 a.m., and Plaintiff "was never asked to come at that early time." (*Id.* at 39–40). When Plaintiff worked at the Urology Institute on Tuesdays and Thursdays, Dr. Marsha Glover alleges that Plaintiff arrived at 7:00 a.m. or 7:30 a.m. (*Id.* at 87). Adreian Augusta, an employee at the Urology Institute, swore in her affidavit that she "do[es] not recall" seeing Plaintiff at the Urology Institute either as early as 5:30 a.m. or past 5:00 p.m. (Adreian Augusta, Aff. ¶12–13). However, Dr. Marsha Glover seems to acknowledge that there were times Plaintiff may have worked past 5 p.m. Dr. Marsha Glover alleges that Plaintiff "was never asked" to work past 5:00 p.m., but "if [Plaintiff] took it upon herself to do that, then, obviously, you know, she took it upon herself to do that." *Id. contra Allen*, 495 F.3d at 1214 ("It is not relevant that the employer did not ask the employee to do the work.").

Here, Defendants failed to keep time records during Plaintiff's employment. Therefore, Plaintiff is held to the lesser standard prescribed by the Supreme Court. After reviewing the evidence put forth in the record, the Court finds that a

12

genuine issue of material fact exists as to whether Plaintiff has proven the amount and extent of the overtime work she performed. Plaintiff presented her alleged overtime schedule. Defendants do not deny that at various times during Plaintiff's employment she worked at both Rainbow Pediatrics and the Urology Institute. But Defendants dispute the precise amount of time Plaintiff spent between both clinics—a factual issue at the heart of Plaintiff's FLSA claim for overtime wages. This Court cannot resolve such a factual dispute, and presuming Plaintiff's evidence to be true—as this Court must—a reasonable jury could find for Plaintiff. Accordingly, the Court **DENIES** Defendants' Partial Motion for Summary Judgment.

### B. Retaliation Claims

The FLSA prohibits employers from retaliating against employees who assert their rights provided under the Act. *See* 29 U.S.C. § 215(a)(3). Specifically, the statute prohibits discharge of any employee "because such employee has filed any complaint" under the FLSA. *Id.* A prima facie FLSA-retaliation case requires Plaintiff to demonstrate: "(1) she engaged in activity protected under the act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000) (quoting *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–209 (10th Cir. 1997)). Although the FLSA uses the phrase "filed any complaint," the Act

protects informal complaints, including verbal complaints. *See EEOC v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989).

Defendants argue that Plaintiff cannot establish her retaliation claim because she did not engage in protected activity and she did not suffer an adverse action. (Doc. 27-1). Particularly, Defendants aver that Plaintiff did not engage in protected activity because she never complained about unpaid wages. (*Id.*). Further, Defendants argue that because Plaintiff's employment ended upon her own resignation rather than Defendants' termination, Plaintiff did not suffer an adverse action. (*Id.*).

Plaintiff's two letters and correspondence from Dr. Marsha Glover are the crux of this retaliation claim. Both of Plaintiff's letters are dated January 4, 2018 and have the same font. Plaintiff contends that she drafted both letters "using the front-desk computer at Rainbow Pediatrics and Dr. Marsha Glover was present at the time." (Williams Aff. ¶ 32). In the first letter, Plaintiff does not mention Defendants' failure to pay her at the Urology Institute, except one sentence where she complains, "I don't get paid enough to go through what I am dealing with." (Doc. 29-1, p. 99). The second letter contains more specific references to the Urology Institute, and it indicates that the parties "have discussed pay[,] and [I am] not getting paid to be there." (Doc. 29-1, p. 101). Plaintiff argues that she intended to resign only from the Urology Institute, and Dr. Marsha Glover asked her to amend the first letter to reflect her willingness to continue working at

14

Rainbow Pediatrics. Her subsequent termination from all employment was retaliation for lodging complaints for unpaid wages. As stated above, Defendants deny that Plaintiff submitted a second letter. Defendants maintain that Plaintiff only submitted the first letter, which effectively served as her resignation. Thus, the parties dispute precisely *how* Plaintiff's employment ended and whether it stemmed from her alleged FLSA complaints.

The Court finds that a genuine issue of material fact exists as to whether Plaintiff engaged in protected activity and whether she suffered adverse action from her employer. This Court cannot resolve such factual disputes, and presuming Plaintiff's evidence to be true—as this Court must—a reasonable jury could find for Plaintiff. Accordingly, the Court **DENIES** Defendants' Partial Motion for Summary Judgment.

## V.　CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Partial Motion for Summary Judgment (Doc. 27). This case shall be placed on the Court's next available trial calendar.

**SO ORDERED** this 30th day of September, 2019.

　　　　　　　　　　　　　　　　*s/ Hugh Lawson*
　　　　　　　　　　　　　　　　**HUGH LAWSON, SENIOR JUDGE**

kac